IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **PHILADELPHIA HOUSING AUTHORITY** : | |
| : | |
| v.   : | **CIV. NO. 07-5434** |
| : | |
| **UNITED STATES DEPT. OF HOUSING AND URBAN DEVELOPMENT, et al.** : | |

**Diamond, J.**                                                                                                        **March 31, 2008**

**MEMORANDUM**

     The Philadelphia Housing Authority asks me to compel the Department of Housing and Urban Development to enter into a contract with PHA that HUD finds unacceptable. Because PHA has not demonstrated its entitlement to this mandatory injunctive relief, I am compelled to deny its Motion.

**BACKGROUND**

     PHA annually receives approximately $336,489,721 in federal aid through its "Moving to Work agreement" with HUD. (Doc. No. 2 at Ex. D.) On December 17, 2007, HUD informed PHA by letter that it had found PHA in default of the MTW agreement because of PHA's failure to make its properties handicapped accessible as required by Section 504 of the Rehabilitation Act of 1973 and Title II of the American with Disabilities Act of 1990. HUD threatened to terminate MTW funding if PHA did not take corrective action in ten days. (Doc. No. 50 at Ex. V.) On December 26, 2007, PHA commenced the instant action against HUD and its Secretary, Alphonso Jackson -- who announced his resignation earlier today. PHA moved for injunctive relief, contending that a termination of MTW funding was illegal and would irreparably harm

1

PHA and its residents.  (Doc. No. 2.); 28 U.S.C. § 1331.  Following the Parties' participation in several telephonic and chambers conferences, HUD agreed that it would not terminate the MTW agreement before its March 31, 2008 expiration date.  PHA, in turn, withdrew its request for immediate injunctive relief.

In light of the MTW agreement's imminent expiration, HUD has informed PHA that it could remain in the MTW program only if it entered into HUD's new, standardized agreement.  Accordingly, since December of last year, the parties have attempted without success to negotiate a new MTW agreement.  (See Doc. No. 50 at Ex. Y.)  The new agreement proposed by HUD apparently continues the same level of funding as the present agreement, but imposes accounting and oversight requirements PHA finds unacceptable.  Id.; Doc. No. 57; Philadelphia Housing Auth. v. HUD, No. 07-5434 (Mar. 27, 2008) ("Oral Arg. Tr.") at 27:19-29:6.  See, e.g., MPHA Amended and Restated MTW Agreement, available at http://www.hud.gov/utilities/ intercept.cfm?/offices/pih/programs/ph/mtw/pdfs/agreements/minnrestated.pdf.  PHA has proposed changes to the standard MTW agreement that HUD apparently believes would effectively renew the existing MTW agreement.  (Doc. No. 57 at Ex. A.)  On March 18, 2008, PHA again moved for immediate injunctive relief, contending that HUD's refusal to renew or extend the existing MTW agreement: (1) violates PHA's equal protection rights; and (2) violates the Administrative Procedures Act.  HUD responded to PHA's Motion on March 24, 2008.  I conducted a hearing on March 27, 2008.  For the reasons that follow, I deny PHA's Motion.

**THE FORMS OF RELIEF SOUGHT**

PHA seeks both a mandatory temporary restraining order and a mandatory preliminary injunction.  I may grant a TRO for no more than ten days without affording the non-moving party

notice or a hearing. Fed. R. Civ. P. 65. The legal prerequisites for the two forms of relief are otherwise the same. See Brown v. Diguglielmo, No. 07-3771, 2007 WL 4570717, at *1 (E.D. Pa. Dec. 26, 2007) (slip copy). Because HUD has received both timely notice and a hearing with respect to PHA's Motion, I will not distinguish between the two forms of equitable relief PHA seeks. See id.

**STANDARDS**

The requirements for a preliminary injunction are well known. "[A] plaintiff must show both (1) that the plaintiff is reasonably likely to succeed on the merits and (2) that the plaintiff is likely to experience irreparable harm without the injunction." Conchatta, Inc. v. Evanko, 83 Fed. Appx. 437, 440-41 (3d Cir. 2003) (citing Adams v. Freedom Forge Corp., 204 F.3d 475, 484 (3d Cir. 2000)). If the moving party makes out these prerequisites, the court may consider the effect granting equitable relief would have on both the nonmoving party and the public interest. Id. "Furthermore, when the preliminary inunction is directed not merely at preserving the status quo but, as in this case, at providing mandatory relief, the burden on the moving party is particularly heavy." Punnett v. Carter, 621 F.2d 578, 582 (3d Cir. 1980) (citing United States v. Spectro Foods Corp., 544 F.2d 1175, 1181 (3d Cir. 1976)). Because PHA has not shown either a reasonable likelihood of success on the merits or irreparable harm, I will deny its Motion without discussing the remaining factors.

**CHALLENGED HUD ACTIONS**

PHA asks me to enjoin two decisions made by HUD: (1) the December 17, 2007 "termination" of the existing MTW agreement; and (2) HUD's refusal to renew the existing MTW agreement.

3

As I have explained, HUD never acted upon its December 17th "termination," and has rescinded that decision by informing PHA that it would not terminate the existing MTW agreement. In fact, that agreement expires today -- March 31, 2008 -- and has not been terminated. In these circumstances, any dispute respecting HUD's December 17, 2007 letter is certainly moot. See, e.g., Rendell v. Rumsfeld, 484 F.3d 236, 240-41 (3d Cir. 2007); see also Pierre v. Bureau of Immigration and Customs Enforcement, No. 04-3759, 2008 WL 542469, at *2 (3d Cir. Feb. 29, 2008). Moreover, the December 17th letter is not "final agency action" subject to judicial review because it has had no practical effect on the parties. See Bennett v. Spear, 520 U.S. 154, 177-78 (1997); Star Enters. v. EPA, 235 F.3d 139, 145 & n.9 (3d Cir. 2000); Hindes v. FDIC, 137 F.3d 148, 161 (3d Cir. 1998); Aerosource, Inc. v. Slater, 142 F.3d 572, 579 (3d Cir. 1998). Accordingly, I will consider only HUD's decision not to renew or extend the existing MTW agreement.

**DISCUSSION**

In the underlying litigation, PHA seeks only equitable relief: an extension of PHA's current MTW agreement with HUD for at least one year. It seeks a preliminary injunction for approximately six weeks, by which time it anticipates that the trial in this matter will have concluded and PHA will have demonstrated its entitlement to the year-long injunction. Because the current MTW agreement expires today and includes no provision for an extension, PHA effectively asks me to impose a new one year contract that HUD finds unacceptable. In explaining its legal entitlement to a one year -- as opposed to a ten year -- extension, PHA explained that at the end of a year "[i]t's not going to be the same cast of characters [making HUD's decisions]." (Oral Arg. Tr. at 23:18-19.) Surely this explanation underscores that there is

4

no legal basis supporting PHA's claim for equitable relief. As I discuss at greater length below, in recent years, some thirteen housing agencies have secured renewals of their MTW agreements with HUD through legislation, not judicial intervention. As I also explain below, PHA has not demonstrated its entitlement to the equitable relief it seeks.

### I. Reasonable Likelihood of Success on the Merits

#### A. Equal Protection

PHA contends that HUD has refused to renew or extend the existing MTW agreement to punish PHA for refusing to transfer land to a friend of HUD's Secretary. PHA believes that this refusal violates equal protection. To succeed on this claim, PHA must show: (1) that HUD treated PHA differently than other similarly situated entities; (2) that HUD did so intentionally; and (3) that there was no rational basis for the difference in treatment. See Hill v. Borough of Kutztown, 455 F.3d 225, 239 (3d Cir. 2006). Under the rational basis test, government action "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." See BellSouth Corp. v. FCC, 162 F.3d 678, 691 (D.C. Cir. 1998) (quoting FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993)). Indeed, as the Supreme Court has explained, administrative and legislative decisionmaking

> inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line, and the fact [that] the line might have been drawn differently at some point is a matter for legislative, rather than judicial consideration.

United States R.R. Ret. Bd. v. Fritz, 449 U.S. 166, 179 (1980).

PHA has not shown disparate treatment. In 2005, Congress required HUD to give those

housing authorities with MTW agreements set to expire before September 30, 2006 extensions of those agreements.  See Transportation, Treasury, Housing and Urban Development, the Judiciary, the District of Columbia and Independent Agencies Appropriations Act, 2006, Pub. L. No. 109-115, 119 Stat. 2396 (Nov. 30, 2005); Doc. No. 32 at Ex. 2 at ¶ 9.  Accordingly, in 2006, the existing MTW agreements between HUD and housing authorities in Cambridge, Louisville, San Antonio, and ten other cities were legislatively renewed.  (Doc. No. 50 at Ex. F.)  PHA did not benefit from this legislation because its MTW agreement was set to expire some eighteen months after September 30, 2006.

HUD also extended the existing MTW agreements of Pittsburgh and Minneapolis.  In December, 2006, Pittsburgh's agreement was extended for three years.  Minneapolis' agreement was extended in August, 2007 for only eight months while HUD finished work on its standardized agreement.  (See Doc. No. 57; Doc. No. 2 at Ex. 5.)   In 2008, when Minneapolis sought again to extend its MTW agreement,  HUD required the Minneapolis Housing Authority to enter into a ten-year standardized MTW agreement.  See, e.g., MPHA Amended and Restated MTW Agreement, available at http://www.hud.gov/utilities/intercept.cfm?/offices/pih/ programs/ ph/mtw/pdfs/agreements/minnrestated.pdf.

PHA has thus failed to demonstrate that HUD has renewed the existing MTW agreement of any housing authority since the standard agreement became available in January, 2008.  Indeed PHA concedes:

> Starting January 1, 2008, HUD informed public housing agencies that
> they could continue to operate under their current MTW agreements
> through the duration of those agreements, or execute HUD's standard
> MTW agreement, which would extend their participation for an
> additional ten years.

(Doc No. 58 at 21 n.10; see also Doc. No. 32 at Ex. 2 at ¶ 12.)  At the hearing in this matter, PHA contended that on December 21, 2007 HUD had renewed Charlotte's existing MTW agreement.  In fact, the record shows that from December, 2006 until December 21, 2007, "Charlotte operated under a very limited interim MTW agreement . . ., which required Charlotte to execute the standard MTW agreement at such time as it became available."  (See Doc. No. 61 (emphasis added).)  On December 21, 2007, Charlotte entered into an agreement that "is similar to the standard MTW agreement."  (See Doc. No. 61.)

It is thus evident that PHA cannot show disparate treatment -- the gravamen of any equal protection claim.  Phillips v. County of Allegheny, 515 F.3d 224, 243 (3d Cir. 2008) ("[T]o state a claim for 'class of one' equal protection, a plaintiff must at a minimum allege that he was intentionally treated differently from other similarly situated . . . .").

In addition, HUD has articulated a rational basis for refusing to renew Plaintiff's current MTW agreement:

> The revisions made to the Agreement serve a number of administrative objectives.  The basic terms of the new Agreement are now standardized to simplify administration of the program.  In addition, the new Agreement requires participating public housing agencies to identify the goals of their MTW program with greater specificity to enable both the public housing agency and HUD to assess or measure how successfully the particular agency's MTW program is meeting its goals.  The new Agreement also provides for more detailed and more comprehensive reports by participating public housing agencies, including project-based (rather than authority-wide) accounting to allow both the public housing agency and HUD to better assess the success of the MTW program in meeting the needs of public housing tenants on a project-by-project basis.

Id. at ¶ 13.

Thus, even if PHA had shown disparate treatment -- which it has not -- HUD has a rational basis for offering PHA a standard MTW agreement.  Olech v. Vill. of Willowbrook, 160 F.3d 386, 388 (7th Cir. 1998) ("If the defendant would have taken the complained-of action anyway, even if it didn't have the animus, the animus would not condemn the action; a tincture of ill will does not invalidate governmental action."), affirmed 528 U.S. 562 (2000) (per curiam); see also Montany v. Wissahickon Sch. Dist., 399 F. Supp. 2d 615, 620 (E.D. Pa. 2005) ("If there was a rational basis for the action of the decisionmaker, there is no equal protection class of one violation, regardless of whether the decision was motivated by animus.") (citations omitted).

In sum, PHA has not shown that it is likely to succeed on the merits of its equal protection claim.  Indeed, the record shows just the opposite.

B.   **APA Claims**

PHA argues that I may review HUD's refusal to renew the existing MTW agreement under sections of the APA that allow a court to: (1) compel an agency to take a discrete action it is legally required to take; and (2) review final agency action and determine whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  See 5 U.S.C. §§ 706(1) & 706(2)(A); Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 62 (2004).

The APA does not authorize judicial review when the action taken by the agency is committed to "agency discretion."  See 5 U.S.C. § 701(a)(2).  Perhaps this is why PHA has cited no case law -- and I have found none -- even suggesting that the APA empowers a district court to review an agency's refusal to renew a contract or to accede to particular contract terms.  That is nonetheless what PHA asks me to do here, even though what little apposite case law I can find indicates that I have no such authority:

> The [plaintiff] seeks review of [a federal] agency's determination not to renew its grant of funding. Such determinations are notoriously unsuitable for judicial review, for they involve the inherently subjective weighing of the large number of varied priorities which combine to dictate the wisest dissemination of an agency's limited budget.

Guttmacher Inst. v. McPherson, 597 F. Supp. 1530, 1536-37 (S.D.N.Y. 1984).

Under MTW's enabling legislation, HUD enjoys wide discretion in both how it implements the MTW program and the terms of the MTW agreements it enters into. See Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. 104-134, Title II § 204 (Apr. 26, 1996). Indeed, "the [enabling] statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Heckler v. Chaney, 470 U.S. 821, 830 (1985); see Omnibus Consolidated Recissions and Appropriations Act of 1996, Pub. L. 104-134, Title II § 204 (Apr. 26, 1996). I am thus unable to review HUD's decision under the APA.

Moreover, even if HUD's refusal to renew were not "committed to agency discretion," the APA provisions PHA invokes do not entitle it to the relief it seeks. HUD has shown without contradiction that it now requires all housing agencies participating in the MTW program to enter into standard MTW agreements when their current MTW agreements expire. HUD and PHA cannot agree on the terms any new MTW agreement should include. In these circumstances, I do not see what agency action "unlawfully withheld or unreasonably delayed" I might compel. 5 U.S.C. § 706(1). No reading of the MTW enabling statute could require HUD to renew the existing PHA contract or to agree to all the terms PHA insists should be in a new MTW contract. See Norton, 542 U.S. at 62; Kaplan v. Chertoff, 481 F. Supp. 2d 370, 399 (E.D. Pa. 2007) ("A

9

'central point' is that 'only agency action that can be compelled under the APA is action legally *required*.'").

It is also apparent that HUD's refusal to renew the existing PHA agreement is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). HUD has articulated a rational basis for requiring standardized MTW agreements with all participating housing agencies. Thus, even if HUD's actions were not discretionary and so subject to my review, I cannot say HUD violated § 706(2)(A). See, e.g., Soc'y Hill Towers Owners Ass'n v. Rendell, 210 F.3d 168, (3d Cir. 2000) (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415-17 (1971) ("Section 706(2)(A) requires a finding that the actual choice made was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.").

In sum, it is apparent that, as with its equal protection claim, PHA has failed to show a reasonable likelihood that it will prevail on the merits of its APA claim.

### II. Immediate and Irreparable Harm

Again, PHA has failed to meet its burden. It alleges that the proposed standard MTW agreement will: (1) cut PHA's federal funding from approximately $330 million to approximately $290 million; and (2) reduce PHA's spending flexibility, which would result in the immediate firing of security personnel and the freezing of all admissions to public housing. (Doc. No. 50; Oral Arg. Tr. at 5:12-20, 34:23:25.) PHA has offered no evidence to support these allegations. PHA has not offered in evidence the standard agreement proposed by HUD. To

date, PHA has submitted no evidence to show that the proposed standard agreement would reduce PHA's federal funding.  Indeed, until March 29, 2008, virtually all the supporting evidence PHA offered had nothing to do with the consequences of PHA's entering into the standard MTW agreement.  Rather, PHA's evidence set out the harms that would ensue if HUD terminated PHA's participation in the MTW program.  (See, e.g., Doc. Nos. 50 at Ex. E; 54 at Ex. A; 2 at Exs. E & D; 42 at Ex. A.)  Until March 29, 2008, the only evidence PHA submitted regarding harm the standardized agreement might cause was a December 14, 2007 letter from one of its lawyers, suggesting the following difficulties: (1) asset management provisions that will hamper local services and program choices; (2) removal of procurement waivers that are critical to promoting housing choice; (3) provisions that adversely affect other agreements and regulations; (4) incompatible reporting requirements; and (5) default and certification provisions that will hinder long-term MTW commitments.  (See Doc. No. 50 at Ex. Y.) On March 29th -- eleven days *after* it filed the instant Motion, and two days *after* the hearing in this matter -- PHA submitted a "supplemental affidavit" that added some detail to the December 14th letter. (Doc. No. 63.)  For instance, the affiant states:

> If PHA were forced to sign a so-called Standard Agreement, it would be required to lay off approximately 186 people due to inadequate funds.  As a result, PHA would have inadequate staff to provide critical services such as maintaining the computer systems that permit PHA to expeditiously fix breakages and problems in residents' units and at PHA developments.  This would subject PHA residents to lengthy waits for even routine maintenance and repairs of their units.

(Doc. No. 63 at Ex. 1 ¶ 3.)  The affiant does not indicate when these "layoffs" would occur.  The "supplemental affidavit" also provides that by restricting PHA's spending flexibility, the standard agreement would interfere with PHA's management style and plans, such as its "10 year $1

11

billion development plan to change the face of its public housing." (Doc. No. 63 at Ex. 1 ¶ 9.)

Putting aside that such a belated submission is grossly unfair to HUD (which has had no opportunity to depose the affiant or respond to her affidavit), the harms set out in the "supplemental affidavit" are a far cry from the harms PHA alleged would ensue if HUD outright terminated the MTW agreement -- the laying off of security guards and the freezing of public housing admissions. Even considering PHA's belated submission, it has not made out immediate or irreparable harm:

> [I]rreparable harm, as a concept to be considered in the context of a preliminary injunction, is related to, but not the equivalent of, the hardship-to-the-parties . . . . [T]he requisite is that the feared injury or harm be irreparable-not merely serious or substantial. 'The word means that which cannot be repaired, retrieved, put down again, atoned for . . . .'

A.O. Smith Corp. v. F.T.C., 530 F.2d 515, 525 (3d Cir. 1976) (citation omitted).

During the hearing in this matter, counsel for HUD repeatedly stated that the standard MTW agreement -- with its "Attachment D" that allows for some "customization" of the contract -- would not impair PHA's ability to pay security staff or admit new residents. (See Oral Arg. Tr. at 27:19-29:8, 35:11-20, 36:16-20.) PHA's belated submission confirms the veracity of these statements.

In these circumstances, it is apparent that the great bulk of the harms alleged by PHA will accrue only if PHA chooses to end its participation in the MTW program. Even then, however, HUD is prepared to help ameliorate any adverse consequences by entering into a "transition" with PHA, during which it would help PHA adapt from MTW program status (enjoyed by less than thirty housing agencies) to non-MTW status (enjoyed by nearly 3,300 housing agencies).

(See Oral Arg Tr. at 29:14-21; Doc. No. 32 at Ex. 2 at ¶ 7.)

In sum, PHA has failed to meet its burden of showing that HUD's refusal to renew or extend its MTW agreement will result in immediate and irreparable harm. On the contrary, if PHA chooses to reject HUD's standard MTW agreement, any harm PHA suffers will be by its own hand, not HUD's.

**CONCLUSION**

Because PHA has not shown that it is entitled to injunctive relief, I deny its Motion.

An appropriate Order follows.

/s/ Paul S. Diamond
_____
**Paul S. Diamond, J.**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **PHILADELPHIA HOUSING AUTHORITY** : | |
| : | |
| v. : | CIV. NO. 07-5434 |
| : | |
| **UNITED STATES DEPT. OF HOUSING AND URBAN DEVELOPMENT, et al.** : | |

## ORDER

AND NOW, this 31st day of March, 2008, upon consideration of Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction (Doc. No. 50), Defendants' Response in Opposition (Doc. No. 57), Plaintiff's Responses in Support of Its Motion (Doc. Nos. 61 & 63), the arguments made at the hearing on March 27, 2008, and all related submissions, it is hereby ORDERED that Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction is **DENIED**.

AND IT IS SO ORDERED.

/s/ Paul S. Diamond

_____
**Paul S. Diamond, J.**